**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-00638-CMA-NYW

ARKANSAS RIVER POWER AUTHORITY,

      Plaintiff,

v.

BABCOCK & WILCOX POWER GENERATION GROUP, INC.,

      Defendant.

---

### ORDER ON PLAINTIFF'S MOTION TO COMPEL

---

Magistrate Judge Nina Y. Wang

      This matter is before the court on Plaintiff Arkansas River Power Authority's ("ARPA") Motion to Compel Further Responses to Discovery ("Motion to Compel") [#35, filed October 21, 2014]. This matter was referred to this Magistrate Judge pursuant to the Order Referring Case dated May 13, 2014 [#19] and the memorandum dated October 22, 2014 [#37]. This court has carefully considered the Motion and related briefing, the entire case file, the arguments offered by the Parties during the March 18, 2015 Motions Hearing, as well as applicable case law. For the following reasons, the Motion to Compel is GRANTED IN PART and DENIED IN PART.

### BACKGROUND AND PROCEDURAL HISTORY

      In its First Amended Complaint, Plaintiff ARPA asserts that Defendant Babcock & Wilcox Power Generation Group, Inc. ("B&W") is liable for breach of contract, negligence, misrepresentation, and fraud arising out of an agreement whereby ARPA

purchased a coal-fired steam boiler supplied by B&W at the cost of approximately $20.5 million. [#80].[1]   In April 2005, ARPA entered into a contract with B&W for a coal-fired steam boiler to use in converting a natural-gas electric generation facility into one firing coal, otherwise known as the Lamar Repowering Project (the "LRP") in Lamar, Colorado.   ARPA alleges the steam boiler has never met the performance standards delineated in the contract, and, consequently, ARPA is unable to operate the LRP and has been deprived of the benefit of its $170 million investment in the project.   ARPA further alleges damages resulting from expenditures to cure the steam boiler's deficiencies, fines and penalties levied by state and federal regulators for emissions violations, and costs of ancillary litigation brought by environmental groups challenging the steam boiler's failure to meet emissions requirements.

Originally, the Scheduling Order contemplated an October 1, 2014 deadline for the joinder of additional parties and amendment of pleadings, the completion of discovery by February 16, 2015, and the filing of dispositive motions by March 16, 2015. [#30, #31].   However, after discovery commenced, the Parties encountered multiple disputes, and the court has vacated the discovery, dispositive motion, pretrial order deadline, and Final Pretrial Conference, to be reset once pending discovery motions are resolved.  [#77 and #78].

---

[1] ARPA is a political subdivision "formed in 1979 by the Colorado municipalities of Las Junta, Lamar, Las Animas, Trinidad and Walsenburg and the New Mexico city of Raton for the purpose of operating a wholesale electric utility to supply the electricity requirements of those communities."  [#80 at ¶ 7].

On October 21, 2014, ARPA filed the pending Motion to Compel, taking issue with B&W's Rule 26(a)(1) initial disclosures, responses to seven interrogatories, organization of documents produced pursuant to ARPA's requests, and documents withheld on a confidential basis. [#35].  B&W filed a Response to ARPA's Motion to Compel on November 14, 2015 [#46].  B&W filed a Reply in support of its Motion to Compel on December 8, 2014.  [#56].  With leave of court, B&W filed a Surreply to the Motion to Compel on March 13, 2015.  [#76].

On March 18, 2015, this court held a Motions Hearing at which the Parties represented they had resolved their dispute regarding B&W's initial disclosures and ARPA clarified it sought only to limit the topics identified in the Rule 30(b)(6) Notice, rather than prevent B&W from deposing a corporate representative altogether. During the hearing, it appeared that the Parties had reached agreement with respect to a number of topics that were subject to the pending discovery motions.

Accordingly, the court ordered the Parties to meet and confer regarding the Rule 30(b)(6) Notice to limit the items at issue and to file a joint status report on or before March 30, 2015, identifying what issues had been resolved and what issues, if any, remained outstanding. [*See* #77 and #79].  Following an extension of time, the Parties filed their Joint Status Report on April 13, 2015, stating that "certain issues remain to be resolved." [#86].  The status report did not indicate that the Parties had reached any further agreements with respect to written discovery.  [*Id.*]  This court, therefore, considers the issues related to written discovery ripe for disposition.

In addition, while ARPA requested "a further hearing before the Court to address all remaining issues," this court has reviewed the Parties' filings and the applicable case law, evaluated the duration of time during which these discovery matters have been pending, and has determined that further argument regarding ARPA's Motion to Compel [#35] would not materially assist the court in resolution of these issues.[2]

## ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) authorizes discovery of "any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."   Relevancy is broadly construed, and a request for discovery should be considered if there is "any possibility" that the information sought may be relevant to the claim or defense of any party.   *See, e.g., Sheldon v. Vermonty,* 204 F.R.D. 679, 689-90 (D. Kan. 2001).   However, all discovery is subject to the proportionality limitations imposed by Rule 26(b)(2)(C).   *See* Fed. R. Civ. P. 26(b)(1). Therefore, while the court may order discovery of any matter relevant to the issues involved in the action, it "must limit the frequency or extent of discovery" under certain circumstances.   Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).   It is incumbent upon the court to consider how much discovery is reasonable in a given case in light of the claims and

---

[2] The court notes that ARPA's Motion to Quash [#60] is currently pending, and that B&W has filed its own Motion to Compel [#87], which is not yet fully briefed.  A hearing on B&W's Motion to Compel is scheduled for May 27, 2015.  [#89].  Because both these motions touch upon ARPA's invocation of privilege, the court intends to address them together.

defenses asserted, the significance of the discovery sought to the propounding party, and the costs and burden to the producing party. *See id.* The Federal Rules of Civil Procedure also permit a court to restrict or preclude discovery when justice requires in order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. *See* Fed. R. Civ. P. 26(c).

"When the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevancy by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Simpson v. Univ. of Colo.,* 220 F.R.D. 354, 359 (D. Colo. 2004) (citations omitted). The Advisory Committee Note to the 2000 Amendment to Rule 26(b)(1) directs courts to involve themselves in discovery disputes to determine whether discovery is relevant to the parties' claims or defenses, and if not, to determine whether "good cause exists for authorizing it so long as it is relevant to the subject matter of the action."

ARPA served its First Set of Discovery Requests on B&W on July 3, 2014 [#35-12]. After B&W provided its responses on August 22, 2014 [#35-13], ARPA communicated to B&W its dissatisfaction with the responses to Interrogatories 5, 7, 8, 10, 12, 14, and 19, and took issue with the fact that the documents responsive to the Requests for Production were provided "without indication of which requests these documents relate to, or whether this is intended to be a complete response to the requests for production of documents." [#35-14]. On September 12, 2014, B&W

responded that it would endeavor to provide a supplemental response to Interrogatory No. 5, directed ARPA's attention to certain documents as responsive to Interrogatory No. 19, and stated it had no additional information to supply with respect to Interrogatory Nos. 7, 10, 12, and 14.  [#35-15].

## I.    Interrogatories

At issue before the court are Interrogatories 5, 7, 8, 10, 12, 14, and 19.  The Parties appear to agree that these Interrogatories are relevant to the claims and defenses raised by the First Amended Complaint.   Nevertheless, ARPA argues that B&W failed to provide full and complete responses to these Interrogatories, that the responses are vague, general, and provide no meaningful detail, and B&W's objections are improper as generalized and boilerplate.   B&W insists it has already satisfied its discovery obligations through its original and supplemental responses.   The court considers each of the disputed interrogatories, and the specific arguments of the Parties, in turn.

**Interrogatory No. 5**:

Describe in specific factual detail how B&W determined that the boiler described in its Bid Proposal would meet the flue gas emission guarantees set forth in Section 8 of the Bid Proposal including all emissions modeling, testing, and comparable facility data considered by B&W in connection with the Bid Proposal.

B&W responded:

B&W objects to this Interrogatory on the grounds that discovery is ongoing, and B&W does not yet know each and every fact supporting its defenses, including without limitation each and every "Specific factual detail" regarding the "modeling, testing and comparable facility data considered" in connection with the Bid Proposal submitted over a decade ago. Subject to and without waiving this objection, B&W responds as

follows: B&W determined that the boiler described in the Bid Proposal would meet the flue gas emissions guarantees set forth in Section 8 of the Bid Proposal by applying a design standard based on published and proprietary data for prediction of gaseous emissions from a circulating fluidized bed ("CFB") boiler. By applying that standard, B&W developed an emissions estimate for the Lamar Repowering Project boiler. The standard B&W utilized provided for a bracket, or range, of fuels that included the subbituminous coal-type to which Powder River Basin ("PRB") coals belong. B&W experience [sic] in firing PRB coals in pulverized-coal boilers has shown lower NOx emission on the bituminous coal. For additional information, and pursuant to Federal Rule of Civil Procedure 33(d), B&W will produce non-privileged responsive documents. [#35-23].

ARPA argues that B&W fails to identify the "design standard" or the "published and proprietary data" upon which B&W relied. [#35 at 24-25]. ARPA further argues that B&W fails to specify the "emissions estimate" for the boiler utilizing the "bracket, or range, of fuels" included in the estimate, and thus the response remains incomplete even if B&W supplies the design standard. [*Id.* at 25].

B&W disagrees, asserting that (1) it identified and produced the design standard to ARPA on October 22, 2014, *see* [#46-6], (2) ARPA has not requested other design standards, and (3) requiring it to identify the data used to formulate its emissions predictions standard exceeds requiring it "to make a 'conscientious endeavor' to understand and answer Interrogatory No. 5." [#46 at 9]. Furthermore, B&W asserts, it produced a document with its predictions of NOx emissions on October 8, 2014 (Babcock00416242) [#46-1 at ¶ 11], and several weeks earlier it identified documents responsive to this Interrogatory [#35-11 ("For Interrogatory No. 5, B&W directs ARPA's attention to Babcock00009667 to Babcock00009670, Babcock 00009716, and Babcock00009723 to Babcock00009725)]. [#46 at 9].

At the March 18 Motions Hearing, B&W argued that no other design standards are relevant because Interrogatory No. 5 and indeed the crux of the lawsuit concern only whether the boiler failed to meet Federal and State emissions regulations.  ARPA responded that the design of the boiler controls whether the boiler satisfies the emissions standards because a flaw found in any part of the design would affect the overall emissions.  B&W disagreed, stating that the emissions design is separate and distinct from the other design standards, and protesting that ARPA had raised this issue for the first time at the Hearing.

As an initial matter, the court notes that ARPA's interrogatory seeks "all emissions modeling, testing, and comparable facility data considered by B&W in connection with the Bid Proposal," without regard to whether it was directly considered as part of putting together the Bid Proposal, or whether it was indirectly considered as part of B&W's general knowledge base.  The Interrogatories as propounded do not have time limitation set forth as part of the definitions.  [#35-12 at 14].  The court interprets this interrogatory as limited to emissions modeling, testing, and comparable facility data considered directly by B&W in connection with the February 5, 2004 Bid Proposal, not all modeling, testing, and comparable facility data that went into developing the emissions prediction standard generally.  Otherwise, the interrogatory would be unduly broad and burdensome and turn the task of deciding how to respond into a guessing game.  *See Cartel Asset Mgm't V. Ocwen Financial Corp.*, 2010 WL 502721, *& (D. Colo. Feb. 8, 2010) (noting that omnibus terms like "pertaining to" may cause a discovery request to be overly broad and unduly burdensome on its face).

ARPA argued at the hearing that there are some design features of the boiler that affect the emissions of the boiler, even if they are not specifically denoted "emissions" components.  Even if I take the representations of ARPA's counsel, as officers of the court, as true, *see Selsor v. Kaiser*, 81 F.3d 1492, 1501 (10th Cir. 1996) (observing that as officers of the court, statements of attorneys to the court are virtually made under oath), the plain language of the Interrogatory modifies "modeling, testing, and comparable facility data" with "emissions," so that the request is fairly read to be seeking modeling, testing, and comparable facility data specific to emissions, not simply information about any mechanical component which could potentially impact emissions. Furthermore, there is no agreement between the parties regarding any additional components that affect emissions or corresponding design standards.  Nor can the court determine what components and corresponding design standards fall within such a scope based on the record before it.  Without a clearly articulated nexus between the boiler component and the associated design standard and resulting emissions, the court will not compel discovery of every single design document associated with the boiler.

Accordingly, no later than May 19, 2015, B&W is ordered to supplement its answer to Interrogatory No. 5 with the additional responses provided to ARPA in written or oral correspondence[3] (including but not limited to responsive documents identified pursuant to Rule 33(d) of the Federal Rules of Civil Procedure), as ARPA is entitled to

---

[3] For example, both Parties refer to written correspondence (both formal letters and electronic mail) that provides supplemental information responsive to pending interrogatories, *see e.g.*, [#35-11] and counsel for B&W also indicates that it informed counsel for ARPA of additional responsive documents pursuant to teleconference. [#46-1 at ¶ 12].

have a set of verified discovery responses, as contemplated by Rule 33(b)(3).   In addition, the court orders B&W to identify any data used to generate the emissions predictions specific to the design of the boiler at issue, and to specify the emissions estimate for the boiler utilizing the bracket, or range, of fuels included in the estimate.[4] To the extent that B&W is relying upon produced documents to respond to this (or any) Interrogatory, it must identify those documents with particularity; Rule 33(d) of the Federal Rules of Civil Procedure is not satisfied simply by general references to produced documents.   *See Bayview Loan Servicing, LLC v. Boland*, 259 F.R.D. 516, 518 (D. Colo. 2009).

**Interrogatory No. 8**:

With respect to Thomas Garabedian's letter to Rick Rigel dated January 12, 2009, describe in specific factual detail how B&W had "become aware of the fact that a CFB boiler very similar in design and arrangement to ARPA is not meeting its NOx guarantee," and describe the information "received in the data obtained to date" indicating that there was "more than one problem to overcome to achieve NOx guarantees on the ARPA unit."

B&W responded:

--------

[4] ARPA also seeks supplementation of Interrogatory No. 7 (Describe in specific factual detail the basis for B&W's statement that an "SNCR [selective non-catalytic reduction] system is not required to meet the specified NOx emission level" in Section 6.12 of the Bid Proposal. Your response should include all analysis and data considered by B&W in connection with this statement as of the date the Bid Proposal was prepared), arguing that because this response references the response to No. 5, it is deficient for the same reasons as described above.  ARPA further argues this response is incomplete because B&W did not state what emission level it expected the boiler to achieve without an SNCR.  [#35 at 25].  B&W claims these arguments fail for the same reasons as stated above with respect to its response to Interrogatory No. 5.   Because the court has ordered supplementation of Interrogatory No. 5, it assumes that ARPA's concerns regarding Interrogatory No. 7 will also be resolved.

B&W designed a CFB boiler for AG Processing, Inc. in Hastings, Nebraska (hereinafter the "AGP project"), which boiler was similar to the Lamar Repowering Project boiler, including without limitation in its use of PRB coal. Preliminary tuning data received by B&W in the Fall of 2008 from the AGP project indicated the following: unusually high uncontrolled NOx at primary air/secondary air split and excess air; unusually high fuel reactivity resulting in reduced upgraded brown coal ("UBC") in ash, which in turn causes NOx to increase; unusually heavy ash resulting in its reduced entrainment to upper furnace, and in turn leading to lower heat transfer and higher bed temperature, increasing NOx levels.   These observations led Mr. Garabedian to write the January 12, 2009 letter to Rick Rigel referenced in this Interrogatory.  For additional information, and pursuant to Federal Rule of Civil Procedure 33(d), B&W will produce non-privileged responsive documents.  [#35-23].

ARPA argues that B&W fails to identify the "tuning data" it received, the amount of "unusually high uncontrolled NOx," the "unusually high fuel reactivity" or the "unusually heavy ash" data which led B&W to its conclusions.  ARPA concedes that counsel for B&W produced tuning data (Babcock00416219) on September 26, 2014, which counsel stated may be responsive to this Interrogatory [#35-15], but remains adamant that the documents identified by B&W as responsive (Babcock 00153402-00153408) are insufficient and do not identify the amount of NOx, fuel reactivity, or ash relied upon by Defendant.  [#35 at 26 (citing #35-11)].

B&W claims that after receiving Plaintiff's September 2014 letter, it supplemented its response to this Interrogatory by "identifying specific documents responsive to [the] request, including an internal memorandum titled 'Discussions of Hastings NOx Data and Impact on ARPA,' and tuning data."  [#46 at 10 (citing #35-11, "("For Interrogatory No. 8, B&W directs ARPA's attention to Babcock00153402 to Babcock00153408")].  [*See also* #35-15].  B&W argues that ARPA's dissatisfaction with the memorandum

"does not mitigate the document's responsiveness and was never raised by ARPA prior to filing its Motion." [#46 at 10].

ARPA replies that the memorandum is an incomplete summary that does not include the requested data, and, furthermore, it may have been "manipulated, aggregated, or condensed in ways that obfuscate the underlying raw data." [#56 at 8]. ARPA also argues that B&W has an affirmative duty to identify which documents are responsive and suggesting that they "may" be relevant is insufficient.

To the extent ARPA believes that the document produced by B&W is "manipulated, aggregated, or condensed in ways that obfuscate the underlying raw data," the record before the court does not lead it to such a conclusion. The court, therefore, interprets ARPA's request as one for the underlying data considered by B&W in reaching the conclusions reflected in the January 12, 2009 letter. Again, the court orders B&W to supplement its response to Interrogatory No. 8 to reflect information provided to ARPA through correspondence. In addition, if there is data separate from the already-produced tuning data that reflects the "amount of 'unusually high uncontrolled NOx," the 'unusually high fuel reactivity," or the 'unusually heavy ash' data which led B&W to its conclusions," B&W is ordered to identify it and/or produce such data pursuant to Rule 33(d) no later than May 19, 2015. Finally, because ARPA is concerned that B&W only indicated that the identified documents "may" be responsive, B&W is reminded that to rely on Rule 33(d), parties must identify in their answers to interrogatories specifically which documents contain the requested information, and once identified pursuant to Rule 33(d), ARPA is entitled to rely upon such documents as

an affirmative response to the pending interrogatory.   *See Bishelli v. State Farm Mut. Auto Ins. Co.*, No. 07–cv–00385–WYD–MEH, 2008 WL 1898406, at *1 (D. Colo. Apr. 28, 2008).

**Interrogatory No. 10**:

Describe in specific factual detail, all studies, analyses, testing or modeling performed by B&W to determine whether the SNCR system proposed for the Lamar Repowering Project would bring the boiler into compliance with the flue gas emission guarantees of the Contract.

B&W responded:

B&W objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome, particularly in its use of the term "all."  Subject to and without waiving these objections, B&W responds as follows: The B&W-designed CFB boiler at the AGP project, which boiler also used PRB coal, achieved NOx emission limits of 0.08 lb/MBtu utilizing B&W's standard SNCR system.  This successful implementation of an SNCR system on the AGP project led B&W to believe that a similar system would be sufficient for meeting the NOx emission limit of 0.09 lb/MBtu that was applicable to the Lamar Repowering Project boiler.  For additional information, and pursuant to Federal Rule of Civil Procedure 33(d), B&W directs ARPA to the documents Bates-labeled Babcock00028984-Babcock00028988, produced with these written responses. [#35-23].

Interrogatory No. 12 seeks the same information, except as related to "2011 Modifications."[5]  ARPA argues B&W's responses to Interrogatory Nos. 10 and 12 are

---

[5] **Interrogatory No. 12**:

Describe in specific factual detail all studies, analyses, testing or modeling performed by B&W to determine whether the 2011 modifications to the Lamar Repowering Project boiler would bring the boiler into compliance with flue gas emission guarantees of the Contract.

B&W responded:

B&W objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome, particularly in its use of the term "all."  Subject to and without waiving

incomplete because they do not address the testing directed at the SNCR system or the 2011 Modifications proposed for the Lamar Repowering Project, and disputes that the documents identified by B&W as responsive (Babcock 00291917-00291955) are relevant to the inquiry.  [#35 at 27 (citing #35-11)].  ARPA requests that if B&W "did not perform any studies, analyses, testing or modeling in connection with the SNCR system proposed for the Lamar Repowering Project," or the 2011 Modifications, that it simply confirm such.  [#35 at 27, 28].

B&W claims its responses reflect its efforts to understand the requests and provide a direct response by identifying specific documents in which B&W personnel evaluate their experiences implementing modifications with the AGP project.  B&W also states that prior to the filing of this Motion, it supplemented its response to Interrogatory No. 10 to include an internal final job report on the SNCR as applied to the LRP.  The report included a description of the "technical considerations which went into" the

---

these objections, B&W responds as follows: B&W's experience with the AGP project boiler informed its determination that the 2011 modifications to the Lamar Repowering Project boiler would bring the boiler into compliance with the Contract's flue gas emission guarantees. The AGP project boiler, a CFB boiler similar to the Lamar Repowering Project boiler, successfully achieved NOx emission limits of 0.08 lb/MBtu. The design and performance features of the AGP project boiler that supported its ability to achieve emissions limits of 0.08 lb/MBtu are: (a) an SNCR system that includes nozzles in the upper furnace for injecting ammonia (with carrier steam) and nozzles in the mid-furnace for injecting steam; (b) reduced excess air; (c) reduced primary-to-secondary air ratio; and (d) the feed of fine sand for adequate furnace heat transfer to achieve the target bed temperature. All of these features were incorporated into the 2011 modifications to the Lamar Repowering Project boiler. For additional information, and pursuant to Federal Rule of Civil Procedure 33(d), B&W directs ARPA to documents Bates-labeled Babcock00028984-Babcock00028988, produced with these written responses. [#35-23].

SNCR's design. [#46 at 10 (citing #35-11, directing ARPA to Babcock00291917 to 291955)].

ARPA replies that it saw documents from B&W on November 17, 2014 referring to kinetic modeling used for the LRP in 2011, and that this kinetic modeling was never discussed nor described in B&W's interrogatory responses indicating that B&W's responses to Nos. 10 and 12 are incomplete.

Interrogatory Nos. 10 and 12 are fairly interpreted to seek information as to studies, analyses, testing or modeling performed by B&W specific to the LRP to determine whether the proposed SNCR system or the 2011 Modifications would bring the boiler into compliance with the flue gas emission guarantees of the Contract, including but not limited to kinetic modeling. Therefore, the court again orders B&W to formally supplement their response to Interrogatory Nos. 10 and 12 to reflect any additional information contained in correspondence to ARPA no later than May 19, 2015. While ARPA seeks an express admission from B&W that it did not undertake any studies, analyses, testing, or modeling specific to the LRP (either for the SNCR plan or the 2011 Modifications), ARPA may interpret (and argue) B&W's failure to identify any such studies, analyses, testing or modeling works as admissions. Beyond that, Interrogatory Nos. 10 and 12 as written are not the appropriate vehicles for ARPA to achieve the type of admission it currently demands.

**Interrogatory No. 14**:

Describe in specific factual detail all modeling, testing and analysis performed by B&W to determine whether the 2012 modifications to the Lamar Repowering Project would bring the boiler into compliance with the flue gas emission guarantees of the Contract.

B&W responded:

> B&W objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome, particularly in its use of the term "all."  Subject to and without waiving these objections, B&W responds as follows: B&W performed the following modeling, testing, and analysis with respect to the 2012 modifications: First, from September 2011 to November 2011, detailed testing was performed at the Lamar Repowering Project. Specifically, during periods of operation in this timeframe, minute-by-minute data was collected through the Lamar Repowering Project plant's distributed control system (DCS system). Also during this time period, B&W installed and collected emissions data from an emissions-monitoring grid in the boiler. B&W further tested various flows, temperatures, and pressures through independent measurements.  Second, B&W's design engineering department analyzed the data collected from the Lamar Repowering Project to look for trends in the many factors that lead to NOx formation, CO burnout, and SNCR effectiveness. B&W also analyzed data from the AGP project boiler, another B&W-designed CFB boiler using PRB coal. A side-by-side analysis of data from the two plants was conducted to determine differences between them.  Third, B&W performed various forms of modeling, including both heat-transfer and kinetic models. These models were used to verify conclusions made in the data analysis phase of the engineering.  For additional information, and pursuant to Federal Rule of Civil Procedure 33(d), B&W directs ARPA to the documents Bates-labeled        Babcock00028989-Babcock00042533        and Babcock00042543-Babcock00042545, produced with these written responses. [#35-23].

ARPA argues that B&W fails to describe what data was collected, what analyses were performed, and what conclusions were reached.  [#35 at 28].  B&W contends that it has fully answered this Interrogatory and, moreover, identified a large amount of data and over thirty pages of charts (Bates Babcock00028989 and Babcock00029020) "with the type of minute-by-minute data from September 2011 that is referenced on page 15 of B&W's discovery responses."  [#46 at 11].  ARPA replies that B&W's identification of 13,546 pages of documents fails to fulfill its obligation pursuant to Rule 33(d) to "specify

the records that must be reviewed in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." [#56 at 9].

As discussed above, ARPA is correct that B&W cannot satisfy its obligations under Rule 33(d) of the Federal Rules of Civil Procedure with a wholesale dumping of documents. *See Bayview*, 259 F.R.D. at 518. But B&W also cannot be forced to prepare ARPA's defense. *Id.* at 519. Without additional context of the substance of the 13,546 pages (*e.g.*, what kind of documents; how many documents, the manner in which the data is reflected, how the text is searchable), the court's substantive review of this issue is stymied and it cannot conclude that B&W's response is "too generic" or fails to provide "any meaningful level of specificity." Therefore, the court will compel B&W to supplement its response with any additional information provided to ARPA through correspondence, and identify bates ranges for documents, from the 13,546 pages that are associated with the three categories of testing, modeling, and analysis identified in its existing interrogatory response: (1) detailed testing performed at the LRP between September 2011 to November 2011; (2) data analyzed by the B&W design engineering department; and (3) various forms of modeling, including heat transfer and kinetic, performed by B&W, no later than May 19, 2015.

**Interrogatory No. 19**:

Do you contend that the 2012 modification to the boiler of the Lamar Repowering Project proposed by B&W, if installed, would bring the boiler into full compliance with the flue gas emission guarantees in the Contract? If so, please describe in specific factual detail the basis for this contention, including all facts supporting this contention.

B&W responded:

Yes. B&W directs ARPA to its response to Interrogatory number 14 above. In addition, the following facts support the proposition that the 2012 modifications would ensure the Lamar Repowering Project boiler's compliance with the Contract's flue gas emission guarantees: Three of the 2012 modifications will reduce the CO concentration leaving the boiler's lower furnace and allow reduction of excess air. This reduction in excess air will, in turn, reduce uncontrolled NOx emissions and lighten the workload for the SNCR system. The reduced CO concentration will also reduce the competition for the OH-radical at the SNCR injection location. These three 2012 modifications are:  (a) Adding rear wall fuel ports allows fuel to be more evenly distributed throughout the furnace. This reduces the effect of a CO plume and allows the air and CO to be more effectively mixed at the overfire air ("OFA") location.  (b) The addition of steam injection nozzles increases mixing near the walls where the fuel feed is introduced, in turn reducing the CO concentrations in those locations. (c) The changes to the crusher reduce the amount of finer fuel, which fuel devolatizes more rapidly than coarser fuel.  In addition, the following two 2012 modifications will increase the SNCR's overall effectiveness: (d) The lowering of the SNCR nozzles, which will increase the residence time for the NH3/NOx reaction and, in turn, the average temperature for the SNCR reaction.  (e) Removing wing-wall surface, which will increase the average temperature for the SNCR reaction.  [#35-23].

ARPA argues this response is vague and unspecific, particularly in its failure to identify the data upon which B&W relied and by what amount the modifications would reduce the CO concentration.  [#35 at 29].

B&W responds that it initially provided approximately two pages of written responses and identified various documents as containing additional information [#46 at 11 (citing #35-13 at 21-22, 15-16)].   Then, after receiving ARPA's September 2014 letter, it supplemented its response by creating a Power Point presentation "specifying various values requested in ARPA's letter, and including various slides addressing the interaction and interdependency of CO concentrations with other factors."  [*Id.* (citing #35-15)].  B&W claims that ARPA never communicated its dissatisfaction with B&W's supplement and complained for the first time in the Motion that the presentation "does

not include the underlying data." [#46 at 12]. B&W states its efforts satisfy Rule 33. [*Id.*]

ARPA replies that these issues were relayed to B&W during their October 17, 2014 telephone call, and that without documentation demonstrating the level to which the proposed modifications will reduce CO concentrations in the boiler ARPA cannot comprehensively analyze the viability of those proposed modifications. and that B&W continues to fail to provide the underlying data relied upon by B&W. [#46 at 9].

Again, the court orders B&W to supplement its response to Interrogatory No. 19, no later than May 19, 2015, with information provided to ARPA through correspondence. The court assumes that B&W has produced the data upon which it relied to create the Power Point presentation, including but not necessarily limited to the 13,546 pages that are identified in response to Interrogatory No. 14. To the extent that B&W's supplementation of Interrogatory No. 14 does not identify where the data underlying the Power Point presentation is produced, the court orders B&W to do so in response to Interrogatory No. 19, no later than May 19, 2015.

## II.   Requests for Production

ARPA asserts that B&W has produced over 420,000 pages in response to ARPA's First Set of Discovery Requests,[6] but declined to provide an index of the documents on the basis that the documents were produced in the usual course of its business. ARPA also complains that B&W did not identify where these documents are maintained, the custodians, or the manner in which the documents are organized, and

---

[6] Only 384,000 pages are at issue for the purposes of this Motion.

many of the documents were stripped of their metadata prior to production.  [#35 at 13].

B&W resists providing this index on the basis that such a project would be burdensome

and difficult, and the materials were produced both in the style in which they are kept in

the usual course of business and in a form that is reasonably usable, submitting

declarations in support from B&W employees.  [#46 at 4-8, #46-3, #46-4].  ARPA

concedes in its Reply that B&W has since provided some metadata, but disputes that

the supplemental metadata is sufficient to indicate how the documents were maintained

in the usual course of business.  [#56 at 11].  ARPA further claims it cannot with

reasonable effort locate documents responsive to its requests, and B&W has not

provided essential metadata in conjunction with a TIFF format to constitute a reasonably

usable form.  As a result, ARPA asks the court to order B&W to create an index "linking

the documents produced to specific discovery requests."  [#56 at 7].

Federal Rule of Civil Procedure 34(b)(2)(E)(i) requires a party to produce

documents as the materials are "kept in the usual course of business" or the party "must

organize and label them to correspond to the categories in the request."  If the request

for production does not specify a form for the production, "a party must produce it in a

form or forms in which it is ordinarily maintained or in a reasonably usable form or

forms."  Fed. R. Civ. P. 34(b)(2)(E)(ii).

This District has considered whether Rule 34(b)(2)(E)(i) and (ii) equally apply to

electronically stored information ("ESI"), or whether Rule 34(b)(2)(E)(ii) alone governs.

*See National Jewish Health v. WebMD Health Serv. Group, Inc.*, --- F.R.D. ----, 2014

WL 2118585 at *6 (D. Colo. May 21, 2014) (J. Daniel).  In *National Jewish Health*,

District Judge Daniel ruled that Rule 34(b)(2)(E)(i) does not apply to ESI.  *Id.* at *5-7 (adopting the recommendation of Special Master Ronald E. Hedges and concluding that a party must produce *documents* in accordance with 34(b)(2)(E)(i), and, if the request does not specify a form of production, must produce *ESI* in the form in which it is ordinarily maintained *or* in a reasonably usable form or forms) (citing *United States v. O'Keefe,* 537 F. Supp. 2d 14, 23 (D.D.C. 2008)).

Indeed, Rule 34(a)(1) and the Advisory Committee Note thereto acknowledge that ESI, and therefore, its treatment, is distinct from hard copy documents.  *See* Report of Advisory Committee on Civil Rules to Committee on Rules of Practice and Procedure, July 25, 2005, found in House Document 109–105, at 157 158 (2006) (The Committee decided to recommend making 'electronically stored information' separate from 'documents.')  "The distinction was drawn primarily to recognize the difficulty in fitting different forms of ESI, like dynamic databases that constantly change, within the traditional concept of document."  *National Jewish Health*, 2014 WL 2118585 at *6 (citing John K. Rabiej, *Rabiej on Production of ESI,* Emerging Issues 2628 (July 29, 2008)).  *But see MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318-JWL-DJW, 2007 WL 3010343, at *4 n. 12 (N.D.N.Y. Oct. 15, 2007) (noting that Advisory Committee Notes to the 2006 amendments to Rule 34 make it clear that subsection (i) applies equally to electronically stored information);[7] *City of Colton v. Amer. Promotional Events, Inc.*, 277

---

[7] The Advisory Committee Note to the 2006 amendment to Rule 34(b) instructs that the production of ESI should be subject to requirements comparable to those identified in Rule 34(b)(2)(E)(i).  The Note further advises that if the form of production is not specified by party agreement or court order, the responding party may produce ESI in the form it which it is ordinarily maintained or in a form that is reasonably usable;

F.R.D. 578, 584 (C.D. Cal 2011) (noting the "broad consensus" among courts that Rule 34(b)(2)(E)(i)'s requirements regarding organization of discovery productions apply to both hard copy documents and electronically stored information).

In *Anderson Living Trust v. WPX Energy Production, LLC*, the District of New Mexico similarly relied on Professor Rabiej's exposition of the application of Rule 34 following the 2006 amendments in determining that the parties, by mutually agreeing to transmit discovery in ESI format, had chosen to have Rule 34(b)(2)(E)(ii) govern the production. 298 F.R.D. 514, 526 (D.N.M. 2014) (citing Rabiej, *supra* at *2) ("Subparagraph (E)(i) applies *only* to the production of hard-copy documents, while subparagraph (E)(ii) *exclusively* governs the production of ESI…"). "Searchability" is the reason practical differences between the two production procedures are warranted and indeed exist:

> The option to produce electronically stored information in a reasonably usable form is not precisely the same as the option to produce hard-copy documents organized and labeled to correspond to the request, but it is functionally analogous because producing electronically stored information in a word searchable format can enable a party to locate pertinent information, regardless of any index or labeling provided by the responding party.

*Anderson Living Trust*, 298 F.R.D. at 526 (quoting Rabiej, *supra* at *2). In framing its analysis, the court acknowledged that "[t]he vast majority of courts have treated (E)(i) and (E)(ii) as supplementary rather than alternative" and have "appl[ied] (E)(i)'s organized production requirement to ESI the same way they had before the 2006 amendments, and add[ed] the (E)(ii) form requirement on top of the requirements of

---

however, production in a reasonably usable form does not license the responding party to convert ESI into a different, more burdensome form.

(E)(i)."  *Id.* at 525-26 (citing orders from the District of South Dakota, and Southern and Northern Districts of New York).   It nonetheless held that in determining the form of production, requesting parties could avail themselves of the guarantees of (E)(i) or (E)(ii), "but not both."  *Id.* at 527.  "The drafters of 34(b)(2)(E) contemplated that parties requesting ESI would be able to organize it themselves—in their own way, to their own satisfactory level of thoroughness, and at their own expense—through the use of text-searching technologies like filtering, grouping, and ordering."  *Id.* (citing Rabiej, *supra,* at *2–3).  *See also* Fed.R.Civ.P. 34, Advisory Committee's Notes.   "The nimbleness of current search functionality with ESI software is the very reason the Advisory Committee found it unnecessary to make (E)(i)'s organization guarantees applicable to ESI."  *Anderson Living Trust*, 298 F.R.D. at 527.

I am persuaded by the reasoning in *National Jewish Health* and *Anderson Living Trust* that the parties, having agreed upon an ESI production, must comply with only Rule 34(b)(2)(E)(ii).  The question, therefore, is whether B&W produced its ESI in the form in which it is ordinarily maintained *or* in a reasonably usable form or forms.  The Rule clearly requires one or the other, but not both.  While the court appreciates the challenges for all Parties associated with the production and review of voluminous ESI, after reviewing the Parties' papers and the Scheduling Order, I conclude that B&W has produced its ESI in a reasonably usable form or forms.

The Parties agreed during their Rule 26(f) conference to produce documents in TIFF, PDF, or other "similarly readable format."  [#35 at 8].  In the Scheduling Order, the Parties acknowledge that there would be "significant quantities of electronically stored

information, such ESI would include electronic copies of correspondence and emails as well as drawings and technical information in electronic format and testing data," and that "[t]he parties have agreed to the format in which electronically stored information will be produced." [#31 at 12].

The document production is organized into three categories: approximately 150,000 pages of "Project Lifecycle Management" ("PLM") documents[8]; approximately 220,000 pages of emails and corresponding attachments from B&W's archiving database; and approximately 14,000 miscellaneous documents. B&W included indices for the PLM documents and instructed ARPA on how to reference the indices to locate specific documents. ARPA contends that the indices do not include the document bates numbers, preventing it from correlating the information in the index to the documents produced. [#56 at 4]. B&W produced emails and corresponding attachments from its archiving database along with recipient and sender metadata in a fully text-searchable form. B&W provided metadata, where applicable, that allows ARPA to identify a document by title and an email by recipient or sender. [#46 at 5]. ARPA argues these documents were produced without an email folder structure and B&W failed to correlate the documents to specific requests for production. [#56 at 4]. As for the approximately 14,000 miscellaneous documents, ARPA claims simply that these were produced after it filed its Motion. [#56 at 4].

---

[8] B&W represents that for any given project, the PLM system "records many associated documents and correspondence, which are loaded into that system as part of [its] normal business practices." [#46 at 5].

ARPA acknowledges that B&W produced the majority of documents in TIFF format and that TIFF format is presumably a reasonably usable form. *See Aguilar v. Immigration & Customs Enforcement Div.*, 255 F.R.D. 350, 357 (S.D.N.Y. 2008) (citation omitted); *see also National Jewish Health*, 2014 WL 2118585 at *6. ARPA claims, however, that many of the TIFF documents are *not* in reasonably usable form because they contain limited metadata and missing text, and that while B&W subsequently provided supplemental metadata, the supplemental metadata is insufficient for ARPA to determine how the documents were maintained in the usual course of business. [#56 at 5-6]. As an example, ARPA offers that 5,972 documents share the same search term, "Text Placeholder," and are not subject to an informed search. [#56 at 6]. But B&W provided metadata that allows ARPA to search by attachment, custodian, file type, file name, email sent date, email recipient, email sender, email carbon copy recipient, email subject, location, and native file link. [#76 at 2]. The Sedona Conference has published advisory principles regarding metadata that read in relevant part:

> Absent party agreement or court order specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party where appropriate or necessary in light of the nature of the information and the needs of the case.

*Sedona Principles 2d* Principle 12.[9]   Commentary to Principle 12 provides criteria for determining whether metadata should be produced in a case: "(i) 'what metadata is ordinarily maintained'; (ii) the relevance of the metadata; and (iii) the 'importance of reasonably accessible metadata to facilitating the parties' review, production, and use of the information.'"   *See also Aguilar*, 255 F.R.D. at 356 (citing *Sedona Principles 2d* Principle 12 Cmt. 12a).   "In selecting a form of production, the two primary considerations should be the need for and probative value of the metadata, and the extent to which the metadata will enhance the functional utility of the electronic information."   *Id.* (citing *Sedona Principles 2d* Principle 12 Cmt. 12b) (internal quotation marks omitted).

Memoranda, emails, and electronic records produced in PDF or TIFF format are in usable form if accompanied by a load file containing searchable text and selected metadata.   *See Aguilar*, 255 F.R.D. at 356 (citing commentary to the Sedona Conference Principle 12).   *See also Nat'l Jewish Health*, 2014 WL 2118585, at *6. Almost all documents that were produced are in a format that is fully text-searchable. [#76 at 2].   Of the 5,972 documents that are not searchable, all but 100 documents are attachments to fully-searchable email messages.   [#76 at n.1].   Furthermore, B&W

---

[9]   The Sedona Conference is a nonprofit legal policy research and education organization with a working group comprised of judges, attorneys, and electronic discovery experts dedicated to resolving electronic document production issues. Since 2003, the Conference has published a number of documents concerning electronically stored information, including the *Sedona Principles.* Courts have found the *Sedona Principles* instructive with respect to electronic discovery issues.   *See Aguilar*, 255 F.R.D. at 357 (citation omitted).

made available to ARPA a copy of documents that contain handwritten annotation or other information that was not reproduced in the electronic form. [#46 at 7].

ARPA has not convinced the court that its ability to search the ESI in any way it deems appropriate is compromised.   Nor has ARPA convinced the court that any special circumstance mandates that B&W should have to go beyond the obligations of Rule 34(b)(2)(ii) and undertake additional burdens of correlating its ESI to the specific discovery requests.   Therefore, I find that B&W has satisfied its discovery obligations under Rule 34(b)(2)(E)(ii) as to the PLM documents and miscellaneous documents.   To order B&W to provide additional metadata after the Parties represented to the court that they had discussed and agreed to an appropriate protocol for the production of ESI would be unduly burdensome. [#31 at 12].

With respect to the email archives, one field of metadata remains outstanding, *i.e.*, the folder structure of the individual email user.   B&W argues it is not required to produce metadata as to each email because its central information technology ("IT") department acts as custodian of its electronic files.   [#76 at 2-3].   Presumably, ARPA seeks that information because it believes it is required as part of a production of ESI in the ordinary course of business, but as discussed above, B&W's production need only to be produced in a form that it is ordinarily maintained *or* in a reasonably useable form. Fed. R. Civ. P. 34(b)(2)(ii).   ARPA does not explain why it needs the folder structure of the email archives if such email documents are searchable.   [#56 at 5].   Therefore, the court declines to order B&W to produce the folder structure of the individual email user.

## II.     Modification of Protective Order

Originally, B&W declined to produce the design standards for the original boiler design or modifications thereto without agreement from ARPA to modify the Stipulated Protective Order [#22] to create a class of "HIGHLY CONFIDENTIAL" information. Documents filed under this designation would be viewed by only "the party's attorneys and experts, and perhaps one ARPA representative." [#35 at 33]. After ARPA filed its Motion to Compel Interrogatories, B&W produced the design standards, with the understanding that ARPA would limit their disclosure to attorneys and consulting or testifying experts until the court ruled. [#46-7]. B&W argues the design standards are proprietary and the "root of B&W's success," and the Stipulated Protective Order in its current form is inadequate to protect the designs because it does not prohibit or prevent ARPA from disseminating the standards to employees, principals or agents of associated entities like Lamar Light & Power, and any fact witness ARPA may 'expect to comment or testify' regarding the standards. [#46 at 12-13]. B&W has submitted declaration of Gregory L. Golub in support of its position. [#46-5].

ARPA objects to a two-tiered protective order, arguing that it would "effectively deny ARPA personnel, who have collaborated with B&W engineers and personnel over the past ten (10) years, the ability to review documents related to B&W's design standard unless ARPA identifies which documents it wants an ARPA employee to review (revealing attorney work product) and B&W consents that the specific ARPA employee may review the specific documents." [#56 at 10]. ARPA does not argue that

it must be able to provide access to the design documents to either the principals or agents of associated entities or third party fact witnesses. [*Id.*]

"[A]s a sheer matter of power the court has authority to alter the terms of a protective order it has entered, and ... ordinarily requests to modify are directed to the district court's discretion and subject to review only for abuse of discretion." *S.E.C. v. Merrill Scott & Associates, Ltd.*, 600 F.3d 1262, 1271 (10th Cir. 2010) (citing 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2044. 1, at 575–76 (2d ed.1994)). "The modification of a protective order, like its original entry, is left to the sound discretion of the district court." *Rohrbough v. Harris,* 549 F.3d 1313, 1321 (10th Cir. 2008). Rule 26(c)(7) allows the court to enter a protective order "for good cause shown." Fed. R. Civ. P. 26(c)(7). The party seeking to prevent disclosure of certain materials must first establish that the information sought is a trade secret or other confidential research, development, or commercial information and then demonstrate that its disclosure could be harmful. *Centurion Indus., Inc. v. Warren Steurer & Assocs.,* 665 F.2d 323, 325 (10th Cir. 1981). Upon such a showing, the burden shifts to the party seeking discovery to establish that the disclosure of confidential materials is relevant and necessary to the action. *Id.* at 325-26. Ultimately, the court must balance the discovery needs of the requesting party against potential injury to the responding party. *Id.*

The Stipulated Protective Order in this case limits the use of any discovery material designated "CONFIDENTIAL" to the prosecution or defense of this litigation. [#22 at ¶ 3]. ARPA is required to ensure that all employees to whom they disclose any

CONFIDENTIAL discovery material abide by the terms of the Stipulated Protective Order. [*Id.* at ¶ 3(h).]  Any fact witness who receives the CONFIDENTIAL discovery material is required to execute Exhibit A, which reminds such individual any such discovery material may only be used in connection with the instant action. [*Id.* at 13].

I do not find that restricting the design documents to only counsel, experts, and Rick Rigel is warranted in this case, nor does the modification of the Protective Order to have a second tier appear to be required at this time.  It is undisputed that ARPA and B&W are not competitors.  B&W bears the burden of proving the competitive harm that would result from ARPA disclosing the design standards to its representatives, employees, or outside associates. *See Centurion Indus., Inc.*, 665 F.2d at 325.   B&W satisfies this burden only by "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16 (1981) (internal quotation marks and citation omitted).

B&W fails to specifically articulate how providing ARPA access to the design standards as CONFIDENTIAL under the existing Protective Order poses harm to B&W.  For example, it fails to point to any individual who has left ARPA to work for a competitor of B&W.  It also does not identify any other boiler provider that ARPA is working with, to whom ARPA could inevitably or inadvertently disclose B&W's proprietary design standards. Nor does B&W identify any additional discovery that would be subject to a higher designation than CONFIDENTIAL to warrant an entirely separate tier. Simply put, B&W has not established good cause for a two-tiered protective order. *See, e.g., MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 502 (D.

Kan. 2007) (collecting cases that require the party seeking to restrict disclosure demonstrate good cause for the protective order).

Nevertheless, the court is cognizant of a party's duty to protect its trade secrets in order to maintain such protection. *See Hartz v. Luzenac*, 576 F.3d 1103, 1008-09 (10th Cir. 2009). Given the fact that ARPA does not argue that either a principal or agent of its affiliates or any other third party fact witness needs access to the design standards [#56 at 10], the court, by this Order, will preclude access of the design standard that is Bates-labeled HC-Babcock0000001-24 [#46-6] by those categories of individuals identified in Paragraph 3(b) and 3(i). To the extent that ARPA finds that disclosure to individuals in either category is necessary, it may seek leave from the court, and the Parties may address the particularized need and concerns at that juncture.

Accordingly, IT IS ORDERED that:

(1) The Motion to Compel [#35] is **GRANTED IN PART**, to the extent B&W shall supplement its responses to Interrogatory Nos. 5, 7, 8, 10, 12, 14, and 19, consistent with the rulings as set forth in this Order, with, including but not limited to, any information that was provided to ARPA via written and oral correspondence;

(2) B&W will **SUPPLEMENT** its responses to Interrogatory Nos. 5, 7, 8, 10, 12, 14, and 19 no later than **May 19, 2015**;

(3) The Motion to Compel [#35] is **DENIED IN PART**, to the extent that ARPA seeks any further metadata associated with the already-produced ESI;

(4)     The Motion to Compel [#35] is **GRANTED IN PART**, insofar as ARPA is precluded from sharing the design standard Bates-labeled HC Babcock0000001-24 with principals or agents of its affiliates or with third-party fact witnesses; and

(5)     The Motion to Compel [#35] is **DENIED** on all other issues.

DATED: May 5, 2015                          BY THE COURT:


                                            s/Nina Y. Wang_____
                                            United States Magistrate Judge